**In re LLANO DEL RIO CO. OF NEVADA, Inc.**

No. 6113.

District Court, W. D. Louisiana, Lake Charles Division.

Sept. 12, 1939.

D. D. Newman, of Leesville, La., for debtor corporation.

J. R. Ferguson, of Leesville, La., for Rose S. Fertitta, T. J. Bullock, R. F. Brown, Charles Derleth, J. R. Ferguson and Joe Bertino, adm'r of Estate of Bert Bertino, deceased.

Sidney I. Foster, of Leesville, La., for Eli and Mary Beers and Heirs of Pauline and Theo F. Cuno, deceased.

Sidney I. Foster, of Leesville, La., and A. James McDonald, of Memphis, Tenn., for Albert Schmidt, Earle N. Hewitt, George Birzinsky, Charles C. Hayes, Arne Rosland, John H. and Ida M. Van Antwerp and Charles Hoens.

DAWKINS, District Judge.

The above debtor filed with this Court a petition for relief under Section 75 of the Bankruptcy Law, 11 U.S.C.A. § 203, which was approved. Thereafter, application for an order upon the receiver appointed by the State Court, who had been in possession of the corporate property for some years, to turn the same over to a trustee to be appointed by this Court, was presented, as were certain motions to dismiss by creditors and others. The application and motions were referred to the Supervising Conciliation Commissioner, who subsequently heard them at Leesville, Louisiana, near the place where the property and possessions involved were located, and spent several days taking testimony and hearing the arguments. Briefs were thereafter filed by those concerned, and the Commissioner has made his report, which reads as follows:

"A. Report and recommendations of C. T. Munholland, supervising conciliation commissioner, pursuant to orders of reference directing trials of the following applications to dismiss this proceeding:

"(1) Application of Rose S. Fertitta, T. J. Bullock, R. J. Brown, Charles Derleth, J. R. Ferguson and Joe Bertino, Administrator of the Estate of Bert Bertino, for dismissal of this proceeding.

"J. R. Ferguson, Attorney at Law, Leesville, Louisiana

"(2) Application of Eli and Mary Beers and of the heirs of Pauline and Theo F. Cuno, deceased, for dismissal of this proceeding.

"Sidney I. Foster, Attorney at Law, Leesville, Louisiana

"(3) Application of Albert Schmidt, Earle N. Hewitt, George Birzinsky, Charles C. Hayes, Arne Rosland, John H. and Ida M. Van Antwerp and Charles Hoens for dismissal of this proceeding.

"Sidney I. Foster, Attorney at Law, Leesville, Louisiana, and A. James McDonald, Attorney at Law, Rockdale, Mississippi

"B. Report and recommendations of C. T. Munholland, supervising conciliation commissioner, pursuant to order of refer-

ence directing trial of application of the debtor corporation for order directing C. D. Ferguson, receiver appointed by state court, to turn over all assets, books and records to custodian to be appointed by this court.

"D. D. Newman, Attorney at Law, Leesville, Louisiana, and W. H. Cook, Attorney at Law, Shreveport, Louisiana.

"It was stipulated by counsel that the three applications to dismiss and application for turnover order all be consolidated for trial and a note of evidence of the proceeding comprising 152 pages and filed herein on May 9, 1939 is made part of this report by reference.

"The following appearances were made at the trial:

"Mr. D. D. Newman, Attorney at Law, Leesville, Louisiana, representing the debtor corporation.

"Mr. J. R. Ferguson, Attorney at Law, Leesville, Louisiana, representing Rose S. Fertitta, T. J. Bullock, R. F. Brown, Charles Derleth, J. R. Ferguson and Joe Bertino, Administrator of the Estate of Bert Bertino, deceased.

"Mr. Sidney I. Foster, Attorney at Law, Leesville, Louisiana, representing Eli and Mary Beers and the Heirs of Pauline and Theo F. Cuno, deceased; and,

"Mr. Sidney I. Foster, Attorney at Law, Leesville, Louisiana, and Mr. A. James McDonald, Attorney at Law, Rockdale, Mississippi, representing Albert Schmidt, Earle N. Hewitt, George Birzinsky, Charles C. Hayes, Arne Rosland, John H. and Ida M. Van Antwerp and Charles Hoens.

"Numerous documents were offered in evidence which are listed on special pages annexed to this report.

"The Pleadings.

"1. *Application of Rose S. Fertitta et al. for dismissal.*

"The gravamen of this application is as follows:

"(a) That the name of the petitioning debtor is Llano Del Rio Company of Nevada and not the name used by petitioning debtor in filing proceedings wherein the name Llano Del Rio Company of Nevada, Inc., is used.

"(b) That the proceeding under Section 75 was instituted without corporate authority as the purported officers instituting the proceeding herein had all previously either been removed or had resigned official connection with the corporation.

"(c) That in proceedings before the Eleventh Judicial District Court, Parish of Vernon, Louisiana, in cause No. 9363 on the docket of said Court, it has heretofore been held that those instituting this proceeding have no corporate authority, judgment of said Court being dated September 6, 1935; that no appeal has been taken from said judgment.

"(d) That in proceedings in the State Court one Richard Pollard was appointed receiver of said corporation on April 23, 1936 who served until February 18, 1937 when he was succeeded by the present receiver, C. D. Ferguson.

"(e) That petitioning debtor is not now engaged in farming nor has it been engaged in farming for the past four or five years.

"(f) That said petitioning debtor has not for the past several years received any substantial amount of revenue from its farming or agricultural operations and for the past eleven or twelve years has been hopelessly insolvent.

"(g) That farming operations have never sustained petitioning debtor but that it has been maintained by revenues received from various industries by it carried on together with donations by it received from 'socialists', and cooperatives from various parts of the nation.

"(h) That at the present time petitioning debtor has only 120 acres of land susceptible to farming, although it would have additional 220 acres which it had been ordered sold by the Eleventh Judicial District Court deed for which had not been executed prior to the institution of this proceeding.

"(i) That the petitioning debtor owns no tools, implements or machinery with which to carry on farming operations.

"(j) That after being placed in receivership, the receiver attempted to carry on the affairs of the corporation as a going concern but in March, 1938 it was determined by the Court that the affairs of the corporation should be liquidated and approximately three-fourths of the corporate assets have been sold leaving on hand 'only about one-fourth of the original property still in possession of the corporation.'

"(k) That petitioning debtor owes debts secured by mortgages which are far in excess of the value of the real estate upon which said mortgages rest.

"(*l*) That taxes on the property for the year 1931 were not paid and the corporate property was adjudicated to the State of Louisiana and later redeemed in the year 1935 under the five year payment plan by the petitioning debtor, but it defaulted on the first installment payment, which payment was made by Anderson Post Hardwood Lumber Company, Inc., under subrogation and which Company paid 1936 taxes and likewise took subrogation, that the property was again adjudicated to the State of Louisiana for nonpayment of taxes for the year 1937, which taxes are presently being paid by the receiver out of sales of property.

"(m) That during the year 1933 L. D. Woosley, former receiver, seized part of the corporate property for payment of receiver's fees and attorney's fees at which time other creditors seized other property and which seizures were relieved by the corporation executing chattel mortgages on personal property in favor of Regional Agricultural Credit Corporation, part of which said indebtedness remains unpaid.

"(n) That during the year 1935 the petitioning debtor instituted a proceeding before the State Moratorium Commissioner which expired on May 16, 1936 when the corporation was placed in receivership proceedings.

"(o) That the petitioning debtor has 'enjoyed extensions' for payment of debts and preventing foreclosures since 1930 but is still insolvent and has not hope of rehabilitation.

"(p) That the members of the colony have been sustained through sale of assets belonging to the corporation, which assets are now largely exhausted.

"(q) That the industries of the corporation are not in operation and will require an expenditure of at least $5,000 to place the ice plant in operation.

"(r) That due to loss of interest by stockholders whose addresses are unknown, it is impossible to obtain a majority of stock at stockholder's meeting which condition has existed for a period of more than twenty years.

"II. *Application of Eli and Mary Beers and of heirs of Pauline and Theo F. Cuno for dismissal.*

"The gravamen of this application is as follows:

"(a) That Eli and Mary Beers are mortgage creditors of the petitioning debtor in the principal sum of $10,000, not including interest and attorney's fees which is represented by note dated September 4, 1933 and on which nothing has been paid.

"(b) *That the seven named forced heirs of Pauline and Theo F. Cuno* are mortgage creditors of petitioning debtor in the principal amount of $15,000 represented by six $1,000 notes dated December 31, 1919 and nine $1,000 notes dated February 23, 1926, both of which are secured by mortgage on immovable property of petitioning debtor upon which indebtedness there is now a principal balance due of approximately $17,000.

"(c) That the indebtedness of Eli and Mary Beers originated as a principal advance of $10,000 made by them to the corporation under false representations to them by George Pickett, which representations were that during their old age they would be given ease, luxuries and comforts but that they have never received such benefits or even interest on their advance and are presently on relief in the State of California.

"(d) That the corporation was organized in the State of Nevada in the year 1916 and moved to Vernon Parish in Louisiana during the year 1918 which was the sole and only place of activity thereafter.

"(e) That since the year 1916 to the present time, the Board of Directors has been elected to carry on the affairs of the corporation, but that the prerogatives of the Board of Directors and movement of Corporate affairs was arbitrarily assumed by George T. Pickett as President and General Manager.

"(f) That from 1922 to 1935 there were periodical out-breaks and rebellions within the colony group, resulting in friction and litigation and finally in receivership during the year 1937; and that during said period old members of the organization were withdrawing and new ones coming in and support to the members until 1934 was by donations and loans from outside the colony.

"(g) That practically all of the lands of the corporation were acquired from Gulf Lumber Company, or at least ninety-five per centum, which had theretofore cut merchantable lumber and which company in order to promote the project advanced $50,000 to the corporation 'with which to open up farms, install industrial plants and get a firm financial footing upon the lands

which it had contracted to buy for $6.00 per acre.'

"(h) That the $50,000 advanced was used to install an ice factory and various other industries but not for the purpose 'to open up lands, and improve farming facilities and that farming was a "side line" of the corporation on a small scale.'

"(i) That after five or six years of effort and experiment by George T. Pickett and his followers, the indebtedness to Gulf Lumber Company 'had mounted up to more than $60,000.00' and that Gulf Lumber Company agreed to accept settlement of its indebtedness for $25,000 cash and give 9,000 acres of lands to the corporation; that in the year 1930 the $25,000 was paid to Gulf Lumber Company and deed to the 9,000 acres was taken in the name of George T. Pickett.

"(j) That in May, 1935 due to need and bad living conditions members of the colony held a mass meeting and demanded resignation of the Board of Directors and discharge of George T. Pickett as President and General Manager, at which time the resident members put the affairs of the corporation into a new management 'with a new objective of production for profit instead of production for use with the hope that it may begin to pay something upon its heavy debts and mortgage loans due your opponents herein and other creditors who have been induced by George T. Pickett to put their all into his "movement"—a Utopian dream that all mankind should pool their labor, skill, incomes, into one common fund (with nothing owned individually) from which common treasury all should be sustained.'

"(k) That as result of the new Board named from the mass meeting the said George T. Pickett brought a quo warranto proceeding in the Eleventh Judicial District Court, Parish of Vernon, Louisiana, the purpose of which was to reinstate himself and the former board and as result of the trial of said proceedings, the court denied the Pickett application and in the same judgment held that the new board of directors was without authority.

"(l) That the operation of the colony by the corporation was a failure and during the year 1934 in opposition to judgments sought to be foreclosed by creditors, other creditors and members invoked a State Moratorium proceeding which continued until March 14, 1936, during which time there was a great loss and depletion of property.

"(m) That a receiver was appointed in March, 1936 on application of Albert Schmidt et al., creditors, but that said receivership resulted in further loss to the corporation and that it was pertinent to liquidate the affairs of the corporation to which end the receiver is proceeding and has sold practically all of the lands of the corporation and has made arrangements for sale for cash of the industrial plants, etc.

"(n) That the corporation is not entitled to proceed under Section 75 of the Bankruptcy Act for the reason that it is not engaged in farming and to the contrary has leased its lands to other parties, particularly to George T. Pickett.

"(o) That to grant the application of petitioning debtor would add further expense in the administration of the affairs of the debtor as it would be necessary to incur additional expense in the receivership in the State Court in winding up the affairs of the debtor corporation.

"(p) That the Corporation is without management, means, or facilities to make production profitable and that the purported board of directors which provoked this proceeding are not in good faith but are seeking to benefit themselves' by manipulating affairs whereby they would acquire what is left of the corporate property for their separate and individual ownership.

"III. *Application of Albert Schmidt, Earle N. Hewitt et al., for dismissal.*

"The gravamen of this application is as follows:

"(a) That applicants in motion to dismiss are judgment creditors of the corporation whose claims aggregate approximately $7,000 as represented by judgments rendered in April and July, 1934 by the Eleventh Judicial District Court, Parish of Vernon, Louisiana.

"(b) That on January 28, 1935 they filed suit in the State Court praying for appointment of a receiver for the corporation which was delayed by a State Moratorium proceeding for one year but on April 25, 1936 Richard Pollard was appointed receiver who served until February 18, 1937 when the present receiver was appointed.

"(c) That the receiver attempted to carry on the affairs of the corporation as a going concern until December 27, 1937

when the receiver filed application for liquidation of the affairs of the corporation, which order was granted; that the receiver proceeded to sell corporate property and has actually sold approximately ¾ of property and recently had agreed to sell practically all of the remainder of the property when stayed by an order of the Court in this proceeding on February 19, 1939.

"(d) That the debtor corporation was organized about the year 1915 under the laws of the State of Nevada and the purposes were set forth in a certificate of incorporation which is copied in paragraph 4 of said application, which purposes would seem of such broad powers as to entitle the corporation to carry on most any legitimate business imaginable which might have connection with its colony project; that at no time agricultural and kindred operations by the corporation constituted the source of principal income of the corporation and that such operations conducted by the corporation for the past ten years have steadily diminished.

"(e) That the corporation is insolvent.

"(f) That the affairs of the corporation can not be rehabilitated under any plan which would leave ownership of the property in the debtor corporation for various reasons itemized in paragraph 6 of the petition which would appear in effect to set forth that the general system of the colony is an unsound business venture which is allegedly established by the history of the colony from 1917 to date and particularly that in view of lack of interest by stockholders that affairs of the corporation can not lawfully be placed in the hands of a board of directors, and finally that George T. Pickett, who has been the dominating spirit of the colony, had endeavored to conduct affairs of the colony to his personal good rather than that of the colony.

"(g) That in the event the petitioning debtor had the right to file its proceeding under Section 75, such right has been lost due to acquiescence in the State Receivership proceeding whereunder approximately ¾ of corporate property has been sold.

"(h) That sales by the state receiver were for best obtainable prices and fair prices and liquidation should continue in the State Court.

"(i) That there is no hope for successful plan for rehabilitation, particularly in view of the fact that holders of a majority of the capital stock of the corporation can not be contacted for participation in proceeding for reorganization.

"IV. *Application of the petitioning debtor for 'turnover order.'*

"The gravamen of this application is that this Court allowed the petitioning debtor to file its petition for composition and extension under Section 75 on February 19, 1939 and that petitioning debtor is entitled to an order directing C. D. Ferguson, receiver appointed by the Eleventh Judicial District Court, Parish of Vernon, Louisiana, to turn over the assets of the corporation together with all books, papers and documents pertaining thereto to this Court and an order directing appointment of a custodian of property of the debtor corporation.

"The Issues.

"The primary issues presented by the pleadings and upon which testimony and the various documents offered in evidence touch are the following:

"(a) Did the parties who authorized the filing of this proceeding under Section 75 have legal authority or standing to represent the corporation?

"(b) Is the debtor corporation a farming corporation within the intent and meaning of paragraph four of subsection (s) of Section 75?

"(c) Is the petitioning debtor in the statutory good faith as required by Section 75:

"(1) Is it reasonably possible for the petitioning debtor to rehabilitate itself within the intent and meaning of Section 75?

"(2) Has sale during the receivership of approximately three-fourths of the corporate assets made rehabilitation impossible?

"Findings of facts, conclusions and recommendations will be made on each of the foregoing issues in the order in which they are stated.

"(a) *Authority for filing petition.*

"The evidence reflects that during the year 1915 petitioning debtor corporation was incorporated under the laws of the State of Nevada and given the name of Llano Del Rio Company of Nevada. Subsequently the name was changed to Llano Del Rio Company of Nevada, Inc. Prior to the incorporation under the laws of Nevada, the corporation had carried on its ac-

tivities in California but immediately after incorporation moved its place of activity to the Parish of Vernon in the State of Louisiana at a site presently known as New Llano, Louisiana. The charter of the corporation is very broad, giving to it the right to do most anything which may be done by ordinary business corporations. The evidence reflects that the primary purpose of the corporation was to organize a cooperative colony wherein no distinction was to be made between producer, middlemen and consumer, but that all members of the colony were to give their labors for the joint benefit of all.

"The corporation had an authorized capital stock of $5,000,000.00 which was divided into 5,000,000 shares of a par value of $1 per share. Stock could be purchased either in cash or for services rendered, the value of services rendered apparently being fixed on the basis of $1 per day. From the time of incorporation in 1915 to date of trial of the various applications there were outstanding 800,000 shares of the capital stock, of which number approximately 600,000 shares were issued prior to the time the corporation came to Louisiana. Thereafter approximately 200,000 shares were issued.

"The books and records of the corporation did not permit accurate statement as to the number of shareholders. The evidence reflects that between six hundred and seven hundred individuals owned the 800,-000 shares of stock outstanding. Of the six or seven hundred stockholders the whereabouts of approximately four hundred are presently known by the corporation. There would appear to be no practical way to locate stockholders whose addresses are not presently known.

"Only thirty-six of the known stockholders are presently located at the colony and the remainder of the six or seven hundred have scattered throughout the country and there is no evidence that they longer have any interest in the affairs of the corporation beyond occasional inquiries as to progress made in a venture which they at one time thought would provide a Utopia for them.

"The evidence does not reflect what percentage of the six or seven hundred stockholders are farmers, and from the testimony of Mr. George T. Pickett, who has been in close touch with the affairs of the corporation from its inception to the present time, it would appear that there is no way to determine what percentage of the shareholders are farmers.

"Of the thirty-six shareholders who are presently in the colony with their families, which together make up some one hundred thirty inhabitants, there is a serious question as to whether or not they may be classified as farmers within the intention and meaning of Section 75. In this connection the testimony reflects that a majority of the colony population is presently and has heretofore been occupied in the various 'allied industries' to farming operations on the colony property.

"The industries include the following: (1) Power plant which furnished current and water to the homes, industries and farms; (2) the sawmill; (3) the woodworking department; (4) the cannery; (5) the ice plant; (6) the cold storage plant; (7) the peanut butter factory; (8) the machine shop; (9) the blacksmith shop; (10) the ensilage department; (11) the dairy department; (12) the shoe shop; (13) crate factory; (14) printing shop; (15) automobile repair shop; (16) the tailor shop; (17) electric shop; (18) professional teachers and college department.

"The basic idea, however, was for the colonists to build a cooperative which would be self-sustaining and predicated primarily on what could be derived from the soil and the various industries above enumerated and others which were apparently in existence were to be allied industries of the primary farming operation. The testimony conclusively reflects that all workers in the so-called allied industries were at all times subject to call to do whatever was necessary on the farm in the event their services were required and oftentimes the skilled workmen of the industries would labor on the farm.

"As an illustration that the allied industries were connected with the farm, it will be noted that peanuts raised on the farm property were manufactured into peanut butter through the peanut butter plant; that raw milk produced from cattle was processed through the dairy plant into by-products of milk; that fruits and vegetables raised on the farm property were canned at the cannery; that beef and other meats produced on the farm property were preserved in the cold storage plants of the ice factory.

"Except for sales of surplus and barter with other colonies for supplies not by the

debtor corporation produced, there appeared to be no interest in entering the general market, but, as stated, the general plan was to produce sufficient food within the colony for colony consumption and an excess for barter with colonists in different localities. For example, beans and other leguminous crops which were indigenous to the soil in the locality were exchanged for rice from the rice colony located in Texas and from the wheat colony in the middle west, wheat.

"When the colony moved to Louisiana, it acquired 13,270 acres of land in Vernon Parish from Gulf Lumber Company. The property was purchased for approximately $6 per acre and Gulf Lumber Company gave financial assistance to the colony for building the various industries necessary in carrying out the project. At a subsequent date Gulf Lumber Company scaled down its indebtedness and it would appear that the actual price paid by the colony for the land was some $25,000.

"The record reflects that from time to time dissension arose within the colony. For that reason and reasons disclosed by the testimony the personnel of the colony changed as time went on. Members and shareholders would come and go. Annual meetings were required by the charter, but from 1917 to the present date the required majority of stockholders for election of corporate officials was never obtained. George T. Pickett continued during the period to serve as president of the Board of Directors and when vacancies would occur they were filled by the Board then serving from the colonists on the property.

"For a short time in 1927 the property was in a state of receivership proceeding but was subsequently turned back to corporate management.

"On May 3, 1935 dissension in the colony became so acute and feeling among members of the colony grew to such intensity between two factions then existing that the difficulties were described as a 'revolution' at the colony. The then existing Pickett board of directors was called upon to resign and according to testimony given, strong-arm methods were used to force resignations and the affairs of the corporation were taken over by a board which was given the appellation of the 'Ursurper Board.' The Pickett Board of Directors was then shorn of all authority and the 'Ursurper Board' pretended to carry on corporate affairs.

"The administration under the 'Ursurper Board' resulted in continued failure of the colony project. This Board had as its president R. K. Williams, who is one of the members of the purported board of directors which instituted the filing of this petition. At this time I point out that the 'Ursurper Group' has now joined hands with the Pickett faction.

"In August, 1935 the Pickett Board filed a quo warranto proceeding on the docket of the Eleventh Judicial District Court, Parish of Vernon, Louisiana, wherein the right of the so-called 'Ursurper Board' to conduct the affairs of the corporation was questioned and it was sought to remove those officers and set up in their stead the Pickett Board who claim that they had been illegally ousted. The result of the quo warranto proceedings presents an interesting and difficult proposition of law. The Court decreed that the 'Ursurper Board' was unlawfully holding office and exercising corporate authority without right and excluded said officers from management of the corporate affairs. By the same judgment it was decreed that George T. Pickett and his alleged Board of Directors should not be recognized as corporate officials. Among other reasons for the Court's position was that the Pickett Board had theretofore resigned and no shareholders' meeting had been held electing successors or continuing them in office in accordance with charter provisions.

"Since the judgment there has been no meeting of stockholders for the purpose of electing directors and the evidence clearly reflects that it is impossible to convene the required majority of shareholders for the purpose of having an election. As aforesaid, the shareholders are scattered throughout this country and would appear to have no further interest in the corporate affairs.

"In connection with the legal authority of the parties purporting to be the Board of Directors authorizing the filing of the petition, I find as a fact that at the time of the filing of the petition the corporation did not have a Board of Directors and hence there was not corporate authority in George T. Pickett and his alleged board upon which this proceeding could be filed. Furthermore, there was no action by shareholders except impliedly from the six share-

holders, purported directors, who filed the proceeding which of course is an insufficient number of shareholders.

"(b) *The Farmer Status of the Corporation.*

"Paragraph four of Subsection (s) of the National Bankruptcy Act provides that: 'The provisions of this Act [title] shall be held to apply also to partnerships, common, entirety, joint, community ownerships, or to farming corporations where at least 75 per centum of the stock is owned by actual farmers, and any such parties may join in one petition.'

"As set forth in the preceding title, the petitioning debtor failed to prove that 75% of the stock outstanding is owned by actual farmers. To the contrary, it was admitted by Mr. Pickett that the status of the stockholders could not be determined due to the fact that there is no way to contact them. In the preceding title, facts surrounding the organization and operation of the colony were given in connection with the status of the corporate management. The thirty-six shareholder members of the colony would, in my opinion, fall within the classification of farmer due to the primary purpose of the corporation in producing livelihood for the colonists from the soil. While it is true that a majority of the colonists work in the allied industries, it is my opinion that farming was the primary purpose and the allied industries were conducted for the purpose of carrying out the general farming program. All members were at all times subject to call for farm labors. Although the corporation might be classed as being primarily engaged in farming operations and as deriving its principal source of income therefrom, such is not the test of the right to file the proceeding. The statute provides that 75% of the shareholders must be farmers in order to permit the corporation to file the proceeding. Clearly such a showing has not been made and I find as a fact that the required 75% of shareholders have not been proven to be farmers within the definition of Section 75. In passing it is interesting to note that during the State Receivership the inhabitants of the colony numbering more than one hundred thirty persons subsisted almost entirely on products from the soil, produced by the colony. Approximately $20 per month was furnished the colony by the receiver. Later it has become necessary for many of the colonists to apply for Government relief.

"(c) *On Good Faith of the Debtor Corporation.*

"Counsel for various applicants in motions to dismiss strenuously urge that the petitioning debtor is not within the statutory good faith of Section 75. They point out that of the total of 13,278 acres heretofore owned by the petitioning debtor, that there have been conveyed 11,198 acres, or 84% since institution of the receivership. The property sold included timber lands and practically all of the residential houses and 50% of the agricultural lands. The corporation presently owns 20 acres on which are located the industrial plants, 440 acres of agricultural lands, 1,912 acres of cut-over lands and certain livestock and farming tools. The evidence reflects that the receiver has realized $26,427.34 from sales of the 11,198 acres which have been consummated; that 452 acres of land have been ordered sold, together with livestock and farming tools for the authorized price of $4,396.50, but title has not passed due to the fact that this Court enjoined all sales; that there have been offers made for 1,485 acres of unsold land at $9,220, leaving 135 acres of land remaining unsold with no offers for sale. The account of the receiver reflects that all of the lands realized from sale of corporate assets, approximately $11,500, has been paid for taxes assessed against the property and approximately the same amount has been paid as court costs, receivership expenses and attorney's fees and there is still unpaid receivership expenses to the amount of $5,300. Counsel point out that income tax statements which are in the record reflect that using the ten year period beginning in 1929, the following facts are shown:

| | |
|---|---|
| Total losses for period | $204,507.96 |
| Total increase in liabilities | 149,923.70 |
| Total decrease in assets | 154,446.96 |
| Excess of liabilities over assets at the close of period (Deficit) | 376,610.95 |
| Capital assets at close of 1938 | 27,303.43 |
| Indebtedness at close of 1938 | 165,685.59 |

"It is of course impossible to pay the outstanding indebtedness in full out of the assets of the corporation. Counsel argue that the hopelessly insolvent condition of the debtor corporation, together with failure to have filed its proposal for composition or extension and particularly the business history of the corporation, which has been continuously in process of failure and hence it has no right to proceed under Section 75. My interpretation is that Section

75 is to afford relief to debt ridden farmers who are unable to pay their debts because they may be hopelessly insolvent and that the purpose of the act is to permit such debtors through proceedings of composition and/or extension to extend or compromise and settle their debts in such a manner and on such a scale that may rehabilitate themselves provided they make an honest and bona fide proposal and one which is fair and reasonable. I do not believe it was the intention of Congress to preclude a hopelessly insolvent debtor from affording himself of the benefits of Section 75. To the contrary, it is my opinion that such was the very purpose of the Act, particularly in that the composition feature was added to the extension feature. In the instant case, it is true that no plan for composition or extension has been submitted by the debtor. In view of the very complex nature of this case it has not been possible for the petitioning debtor to make a proposal for composition or extension. It has been proven on trial of the case that negotiations are under way with Farm Security Administration for refinancing the debtor corporation. Agents of the Debt Adjustment Committee have made studies of the financial affairs of the corporation and their recommendations have been furnished Farm Security Administration. While it is difficult for the writer to favorably view a successful outcome of present negotiations, I do not believe it within my province to say that financial assistance could not be obtained from the Government. Nor am I in position to say that a reasonable proposal could not be made by the debtor corporation at the proper time. I do not find that George T. Pickett and other proponents of the move for refinancing are in bad faith and, to the contrary, I believe they will strive to the end of refinancing. Counsel for applicants in motions to dismiss have cited numerous authorities which are to the effect that the petitioning debtor must be in good faith in order to conduct his proceeding under Section 75 and in that connection the jurisprudence seems uniform that the proposal of the debtor must be honestly made and, in addition thereto, must be equitable and one which will rehabilitate the petitioning debtor. Most of the questions on the subject of good faith must treat with the requirements of the proposal and the motive of the debtor. As pointed out heretofore, no proposal has been filed by the petitioning debtor for the reason that those who instituted the proceedings are without the particular knowledge necessary for the formulation of a proposal for composition or extension. The record reflects that all books and records have been in the hands of the receiver and that negotiations have been made with the resettlement administration for the purpose of obtaining assistance and at the date of the hearing the proponents of this proceeding were not in position to intelligently form a plan. In regard to position of counsel in applications to dismiss to the effect that sale of approximately three-fourths of the corporate assets in the State Receivership makes rehabilitation of the debtor impossible and by acquiescence in the receivership the debtor is in bad faith. It is my opinion that although if the debtor were entitled to proceed under Section 75, the application should have been more timely filed, the circumstances of the case do not constitute legal bad faith on the part of the debtor corporation. There is left a substantial acreage of farm land presently in cultivation and likewise over a thousand acres of property susceptible to cultivation. Although the substantial portion of assets have been sold, the record reflects that the corporation could continue operations on the acreage presently held and there is direct testimony to the effect that Anderson-Post Hardwood Company has contracted with George T. Pickett for the sale of ample property which George T. Pickett testified he would turn over to the corporation in the event it is reestablished and rehabilitated. I find as a fact that the corporation is not in legal bad faith.

"Recommendations.

"My recommendations are that for the reasons hereinabove set forth, the three creditors' applications for dismissal of this proceeding be granted on the following grounds:

"(1) That there was no corporate authority vested in the parties who caused the proceeding to be filed.

"(2) That the petitioning debtor is not a farming corporation within the meaning of paragraph four of Subsection (s) of Section 75 in that seventy-five per centum of its stock is not owned by actual farmers.

"I further conclude and recommend that the applications insofar as they charge bad faith on the part of the debtor be denied.

"I further recommend that all stay orders and injunctions theretofore issued be vacated and recalled.

"I further recommend that the application of the petitioning debtor for the turnover order be denied. Alternatively, should the court find that the proceeding should be allowed to continue under Section 75, it is my recommendation that the turnover order directing the receiver to deliver corporate property, books and records to a custodian to be appointed by the Court be allowed, the custodian to be named by the Court as soon as practical.

"A copy of this report is this day being forwarded to attorneys of record for the various parties who made appearance herein who are hereby advised that at the expiration of ten days from this date, this matter will be presented to Honorable Ben C. Dawkins, United States District Judge, for his disposition. Any parties desiring to file exceptions or oppositions to this report should so do within said delay. Oppositions may be forwarded to my office at Monroe, Louisiana."

It thus appears that two substantial questions of fact and law are presented, either of which if decided adversely to the debtor would dispose of its application to require the turning over of this property by the State receiver, to-wit, first, did the persons purporting to act for the corporation in seeking relief under Section 75 have authority to do so; and, second, if so, does the record show that 75% of the stockholders were and are engaged in farming or agricultural pursuits?

An examination of the record convinces me that the Commissioner has correctly found the facts and the same are accordingly adopted by this Court.

(1) With respect to the authority of the persons purporting to act for the corporation in instituting this proceeding, it appears that the petition was drawn in the name of the company and in Article 11 thereof, it was alleged as follows: "Petitioner attaches hereto a resolution of the directors of the said Llano Del Rio Company of Nevada, Inc., passed on February 16, 1939, authorizing its president, George T. Pickett to file this petition on behalf of said corporation; that a copy of said resolution certified as true and correct by the Secretary of said Corporation, is attached, hereto."

This resolution was dated February 16, 1939 and recited that a meeting was held at the office of "George T. Pickett, President and General Manager", and that the "board of directors of the Llano Del Rio Company of Nevada do hereby authorize its attorney, D. D. Newman, to make application to 'this Court' for a moratorium under Section 75 of the Bankruptcy Act * * * or to be declared a bankrupt under the Act"; that Pickett "be and is hereby authorized to sign any and all papers, and to perform any other acts that might be necessary for the carrying out of the purposes of this resolution." The members of the board participating are named as Arthur Hoffman, S. R. Archer, H. E. Cothan, Carl. H. Glesser, E. O. Joynes, George T. Pickett and Dr. R. K. Williams, "constituting more than a quorum" and the resolution recites that it was "unanimously passed". It was signed by George T. Pickett, as President, and by S. R. Archer, as Secretary.

The report of the Commissioner has this to say in regard to the status of the persons claiming to be corporate officers:

Since the judgment there has been no meeting of stockholders for the purpose of electing directors and the evidence clearly reflects that it is impossible to convene the required majority of shareholders for the purpose of having an election. As aforesaid, the shareholders are scattered throughout this country and would appear to have no further interest in the corporate affairs. In connection with the legal authority of the parties purporting to be the Board of Directors authorizing the filing of the petition I find as a fact that at the time of the filing of the petition the corporation did not have a Board of Directors and hence there was not corporate authority in George T. Pickett and his alleged board upon which this proceeding could be filed. Furthermore, there was not action by shareholders except impliedly from the six shareholders, purported directors, who filed the proceeding which of course is an insufficient number of shareholders.

There was no appeal by anyone from the judgment of the State Court and it is now final. It has therefore been finally settled by the State Court (which judgment binds all of the parties as well as this Court) that there is not and can not be anyone under the present circumstances with authority to represent the corporation, until new directors are elected. I do not believe the situation presented by this proceeding is one in which the few individual stockholders residing on the property which is still undisposed of could proceed. It is unfortunate that the stockholders are so numerous and scattered that it seems im-

926

possible to have a lawful meeting, but this is the result of the very nature of the corporation itself and I do not feel that this Court can disregard the necessity for action in the manner which the law, charter and by-laws of this corporation require. In any event the application is by the corporation and not by stockholders.

I therefore think that the State Court is better qualified to deal with this situation, especially in view of the fact that it has had the matter in hand for something like three years.

Hence, I agree with the conclusions and recommendations of the Commissioner that the proceeding should be dismissed for the reason that it has not been legally authorized and the same is affirmed.

Having reached this conclusion, I do not think it necessary to pass upon the other point that the petitioners fail to show that 75% of the stockholders are engaged in farming pursuits.

It is therefore ordered, adjudged and decreed that this proceeding be dismissed at the cost of the petitioners.